# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NIVAGEN PHARMACEUTICALS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.   ) | C.A. No. 24-846-GBW |
| ) | |
| AMNEAL PHARMACEUTICALS, INC., ) | **JURY TRIAL DEMANDED** |
| AMNEAL PHARMACEUTICALS of ) | |
| NEW YORK, LLC, AMNEAL ) | |
| PHARMACEUTICALS LLC, AMNEAL ) | **PUBLIC VERSION** |
| PHARMACEUTICALS PVT LTD., and ) | |
| AMNEAL EU, LTD. ) | |
| ) | |
| Defendants. ) | |

## LETTER TO THE HONORABLE GREGORY B. WILLIAMS
## FROM ANDREW M. MOSHOS

OF COUNSEL:

Shashank Upadhye
Yixin H. Tang
Brent Batzer
UPADHYE TANG LLP
109 Symonds Dr. #174
Hinsdale, IL 60522
Tel: (312) 327-3326

Dated: September 23, 2024
11750399 / 23316.00002

Public Version Dated: September 30, 2024

Bindu A. Palapura (#5730)
Andrew M. Moshos (#6685)
Malisa C. Dang (#7187)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
bpalapura@potteranderson.com
amoshos@potteranderson.com
mdang@potteranderson.com

*Attorneys for Plaintiff Nivagen Pharmaceuticals, Inc.*

Dear Judge Williams:

Pursuant to the Court's order (D.I. 53), Nivagen responds as follows regarding the setting of an injunction bond should the Court decide in favor of Nivagen on a temporary restraining order and/or preliminary injunction.

### I.   Nivagen is ready and able to post a bond.

The Federal Rules of Civil Procedure require a bond of some sort in order to issue a preliminary injunction: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). In the Third Circuit, the bond is essentially a requirement when a risk of financial harm exists for the party to be enjoined. *Alexander v. Primerica Holdings, Inc.*, 811 F. Supp. 1025, 1036 (D.N.J. 1993) (citing several Third Circuit cases). Nivagen therefore has expected that a bond would be required in this case, and stands prepared to obtain such a bond should the Court rule in its favor on its Motion for TRO and preliminary injunction and to that end has already been in contact with several potential bond issuing organizations.

### II.   Amneal is in sole possession of facts that would enable a calculation of the bond amount.

However, in order to actually obtain terms for a bond from these issuers, Nivagen must know the amount, which it of course does not know. The measure of a bond is, as the Federal Rules state, the costs and damages sustained by Amneal. Determining that amount requires, among other information, the price Amneal intends to charge, the costs per unit for Amneal's product, the marketing and distribution channels Amneal is prepared to use and the associated expenses,[1] the profits per unit Amneal expects based on all of its costs and expenses and the price it intends to charge, Amneal's manufacturing capabilities (which can limit the amount of the market Amneal can obtain and sales it can make), Amneal's sales capabilities and expected conversion of the market, and other factual information that is solely within the possession of Amneal. As such, Nivagen's opening bond position can only be a guess, as it lacks the facts to be able to put forth a reasonable amount based on Amneal's pricing, cost structure, and manufacturing and sales capabilities. And an injunction bond amount should not be based only on speculation. *See Synthes, Inc. v. Gregoris*, 228 F. Supp. 3d 421, 447 (E.D. Pa. 2017) (citing multiple Third Circuit cases) ("The amount of the bond is left to the discretion of the court, and proof of damages regarding the injunction bond need not be to a mathematical certainty. However, the bond amount cannot be purely speculative." (internal citations omitted)).

---

[1] Such expenses may be difficult to calculate and allocate for a single product, and certainly not for a third party to do. For example, the expenses may include allocation of salaries compensation and benefits to Amneal's sales force, costs of free samples Amneal is prepared to use for marketing, costs of advertising and marketing which may benefit multiple products Amneal sells (e.g. Amneal's other RTU products if the advertising and marketing focuses on Amneal's "expertise and experience" in RTU products).

The Honorable Gregory B. Williams                                                                                                         Page 2
September 23, 2024

### III.   Nivagen's estimate of an appropriate bond amount.

As Nivagen lacks the necessary facts from Amneal, it is better served to address a bond amount in response to Amneal's proposal once Amneal has revealed necessary facts in its opening letter brief. However, in the interest of providing at least some estimate, Nivagen proposes a bond of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to cover a period of six (6) months, for the reasons stated below. This amount is subject to renewal and can be adjusted once the market condition becomes clear upon the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

### A.   Nivagen's calculation of the bond amount.

Nivagen has calculated this number as follows and based on the following assumptions. First, we assume that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ will be approved ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ from when Mr. Shukla submitted his declaration, D.I. 15 ("Shukla Decl."), on August 13, 2024), and Nivagen ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Based on this assumption, the six-month period Nivagen proposes for a bond will contain two phases ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

In the first phase, Amneal's RTU product would have no competition. Amneal could contract with any willing purchasers, absent an injunction. Nivagen expects that within this first phase, Amneal would sign long term contracts with most, if not all, major purchasers for the RTU product. Nivagen estimates that Amneal could achieve a maximum of **1.5% rate of conversion** of the purchases from these contracted purchasers from the existing vial form potassium phosphate injectable products (from all manufacturers). This estimated conversion rate is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that Nivagen expected ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Shukla Decl. at ¶ 7). This is because Amneal is not known for having the best marketing and distribution channels for potassium phosphate injectable products. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See* Ex. 1, an Excel file produced as "HOFMANN001" and referenced as "Monthly Module Views-Sales (NSP)_1_Aug-16-2024.xlsx" in D.I. 30, Appendix 2 to the Hofmann Declaration). Amneal's expert Mr. Hofmann called ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (D.I. 30, Hofmann Decl. at ¶ 59). Amneal has not revealed any partnership with a well-established vial-form market player such as ▮▮▮▮▮▮ ▮▮▮▮▮▮▮ (D.I. 30; Ex. 1). Therefore, Nivagen expects Amneal's initial sales of its RTU product to be low, even though Nivagen expects that Amneal will sign contracts with every major purchaser of the RTU product.

In the first phase, the purchasers would be very interested in Amneal's new RTU product, and most, if not all, major purchasers for the RTU product would likely sign the standard long-duration, "right of first refusal" provision-containing, contracts with Amneal. (*See* Shukla Decl., at ¶¶ 15, 18 (discussion of these contracts)). However, Nivagen would not expect each purchaser to place large orders until the reliability and user preference for this new product has been established. The purchasers would view Amneal as an "insignificant" player in the vial-form market who does not have the endorsement from an established and highly visible market participant like Fresenius Kabi. The purchasers may also have on hand the vial-form products which must be used up before they expire. It is difficult to forecast this initial market conversion

The Honorable Gregory B. Williams                                                                                          Page 3
September 23, 2024

rate that Amneal could achieve – the floor could be as low as 0.3% ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ However, Nivagen believes that an RTU product's advantages over the vial-form should be readily appreciated by all purchasers, so most, if not all, of the large institutional purchasers should be willing to sign contracts and place orders with Amneal as soon as Amneal's RTU product is available, and the market conversion rate should be much higher than 0.3%. Based on the information Nivagen has now, Nivagen's best estimate for this rate is 1.5%, but it must be stressed that Nivagen expects Amneal to be able to contract with almost all purchasers, thereby locking up the nascent RTU market and causing Nivagen irreparable harm.

With a 1.5% product conversion rate ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮ Nivagen estimates that Amneal could achieve in the first phase **a monthly gross profit of $180,000** out of $300,000/month sales. Nivagen estimated ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ could achieve ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Shukla Decl. at ¶ 7). Assuming Amneal's sales price for an RTU product is ▮▮▮▮▮▮▮▮▮▮, and with a product conversion rate of only 0.075 of the 20% for ▮▮▮▮▮▮▮▮, the monthly sales should be: (a) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) divided by (b) 12 months, and further multiplied by (c) a factor of 0.075, which results in $300,000/month. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Shukla Decl. at ¶ 7). Amneal's product would have lower manufacturing costs in India, but it needs to spend more to market its product than Fresenius Kabi, due to Amneal's relative paucity of established channels, a track record, and industrial relationships in this product space. Therefore, ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮ the gross profit Amneal could obtain in phase one would be $180,000/month.

In the second phase ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Assuming the purchasers knew about ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮ when they were contracting with Amneal back in September, the contracts would have provisions that would allow a price war to happen. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮ (*See* Shukla Decl. at ¶ 12). Amneal would probably match that price decrease to retain its customers ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. With a 25% drop in price, Amneal's sales also drops 25% to $225,000/month,[2] and the profit margin is now 46.7% (*i.e.* instead of a $60 profit on $100 of sales, now it's a $35 profit on $75 of sales). This reduces Amneal's **monthly gross profit to $105,000.**

Therefore, Nivagen's best estimate based on the information it currently has, is that Amneal's damages due to a wrongly imposed injunction for the first six months would be ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ These two parts of the estimated damages add up to ▮▮▮▮

---

[2] Without knowing the quality (and Amneal's ability to consistently achieve the required high quality) of the first batches of Amneal's RTU product, and Amneal's ability to manufacture and ship sufficient amounts of its new product in phase one, Nivagen cannot assume that the volume of Amneal's RTU sales in phase two would increase compared to phase one. It may take Amneal longer to achieve a higher volume of sales of its new RTU product.

The Honorable Gregory B. Williams												Page 4
September 23, 2024

### B. Justification for the proposed six-month duration of the bond and the basis for renewal and/or adjustment.

Nivagen notes that it is possible that any preliminary injunction and its attendant bond will not necessarily need to extend through a full trial on the merits. For instance, if the Court grants Nivagen's Motion and imposes an injunction, several months after ███████████ ███████████████████████████████████████████████████████████████, it may become possible for damages to be calculated based on the market conditions that have become clear, and perhaps more importantly, Nivagen will be █████████████████████ ███████████████████████████████████████████. At that time ████████████████████ the injunction could be dissolved, with damages from that point on becoming an issue for trial. Furthermore, even if the injunction should continue through a trial, a bond amount of Amneal's reasonable expected profits for ███████████████████████████████████████████ █████████████████████ (D.I. 54)) would be beneficial for all parties. Amneal can move for an increase in the bond and the parties and Court will have the benefit of market data ██ ███████████ to help provide at least some actual data on conversion of the vial market to the RTU product rather than Nivagen's or Amneal's current estimate and expectation. The bond amount can be more accurately determined with such additional information.



                                                                        Respectfully,

                                                                         */s/ Andrew M. Moshos*

                                                                          Andrew M. Moshos

AMM:nmt/11750399/23316.00002

Enclosure
cc:    Clerk of Court (via Hand Delivery)
        Counsel of Record (via Electronic Mail)