

**WILMINGTON**
**RODNEY SQUARE**

**Anne Shea Gaza**
P 302.571.6727
agaza@ycst.com

September 23, 2024

REDACTED - PUBLIC VERSION
Filed September 30, 2024

**VIA CM/ECF AND HAND DELIVERY**
The Honorable Gregory B. Williams
United States District Court
 for the District of Delaware
844 North King Street
Wilmington, DE 19801

███████████████████
██████████████████████
█████████████████████
████████████

Re:    *Nivagen Pharmaceuticals, Inc. v. Amneal Pharmaceuticals, Inc., et al.*, C.A. No. 24-846-GBW

Dear Judge Williams:

        Defendants ("Amneal") respectfully submit this letter in response to Your Honor's Order (D.I. 53) that each side provide its position on the bond amount the Court should require Plaintiff ("Nivagen") to post if the Court grants Nivagen's request for the extraordinary relief of a preliminary injunction.

        If Amneal is restrained from marketing its FDA-approved ready-to-use ("RTU") potassium phosphates product, Amneal will incur significant harm.[1] As shown below, both parties have forecasted their annual sales and profits with reasonable precision, which makes sense—there is a well-established, multi-player potassium phosphates market in which the RTU product will compete for sales.[2] In other words, both parties recognize that the sales of their RTU products depend on their ability to convert customers from the vial product to the RTU product. Based on Amneal's forecasts, if the Court enjoins Amneal from launching its RTU product and competing in the existing potassium phosphates market, Nivagen should be required to post a bond of **at least** ███████████. This bond amount is supported by (1) Amneal's forecasts, (2) an independent

---

[1] Amneal notes that it obtained FDA Approval on July 26, 2024—a week after it had already been sued by Nivagen (*See* D.I. 1, July 19, 2024 Original Complaint); advised the industry that it anticipated launching its RTU product in late Q3 2024 (D.I. 31-1, Ex. A); and advised Nivagen and the Court that it intends to launch on ████████████████ (D.I. 54).

[2] The parties' ability to calculate their projected annual sales and profits with reasonable precision further confirms that Nivagen's alleged economic harm is not irreparable. *Takeda Pharms. U.S.A., Inc. v. Mylan Pharms. Inc.*, 967 F.3d 1339, 1349 (Fed. Cir. 2020) ("The availability of adequate monetary damages belies a claim of irreparable injury.").

analysis of the well-established multi-player potassium phosphates market by Amneal's economics expert Ivan Hofmann, and (3) Nivagen's own forecasts.

## I.    Amneal's Forecast Supports a Bond of At Least ███ █████

Given the well-established potassium phosphates market, Amneal prepared detailed forecasts for its RTU product. These forecasts include projections of monthly units/packs, average sales price, and sales amounts ("Amneal Projections"). (Contemporaneously-filed Hofmann Dec. ¶8, Ex. A). Mr. Hofmann used the Amneal Projections, along with information on cost of goods ("COGs") provided by Amneal, and prepared a forecast of Amneal's profits through December 2027. (Hofmann Dec. ¶¶- 9 and 12, and Exs. A-C). Mr. Hofmann calculated profits from Amneal's expected launch date through December 2027 of approximately ████████. (Hofmann Dec. ¶¶10-12, Ex. C). Mr. Hofmann then accounted for prejudgment interest using the prime interest rate, which is "regularly awarded to a party who has been wrongfully enjoined." *Takeda Pharms., U.S.A., Inc. v. West-Ward Pharm. Corp.*, C.A. No. 14-1268-RGA-SRF, 2018 WL 6521922 (D. Del. Dec. 12, 2018) (determining that the prime interest rate as of the date the injunction issued "best compensates Defendants as it reflects the rate at which Defendants would most likely have been able to borrow money"); (Hofmann Dec. ¶¶13-14, Ex. D); *see Amgen Inc. v. Amneal Pharms. LLC*, C,.A. No. 16-853-MSG, 2021 WL 4551955, at *9 (D. Del. Oct. 5, 2021) (calculating prejudgment interest on a bond); *see, also, Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1555 (Fed. Cir. 1995) (holding that the court has discretion to award compound interest which ensures that the wronged party is fully compensated) (collecting cases)). Based on Mr. Hofmann's calculations using the Amneal Projections, a reasonable bond amount with prejudgment interest should be **at least $**████████. (Hofmann Dec. ¶15).

## II.    An Independent Analysis of Conversion of the Potassium Phosphates Market Confirms that the Bond Should Be At Least $████████

To assess the reasonableness of the result using the Amneal Projections, Mr. Hofmann next calculated expected profits using the inputs shown in the table below and assumptions for conversion of sales from the vial product to the RTU product in the established potassium phosphates market. (Hofmann Dec. ¶16).



---

[3] Amneal's forecast can be used to calculate its expected profits and the economic harm that it would suffer if wrongly restrained. *See* Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.").

| ███████████████████████████ | | ██ ████████████ |
| --- | --- | --- |
| ████████████████ | | |
| ███████████████████ | | ██ |
| █████████████████████ | | ████ ████ |
| ███████████████ | | █████████ |

(Hofmann Dec. ¶16). Based on the above inputs, Amneal's profits range from ████████████ ██████████ before the incorporation of any prejudgment interest. (Hofmann Dec. ¶17, Ex. E). After prejudgment interest is incorporated, the amount ranges from ████████████████████████. (Hofmann Dec. ¶17, Ex. E). These ranges corroborate the reasonableness of Amneal's requested bond of at least ███████████, which is on the low end of the range of profits that Mr. Hofmann calculated would reasonably be expected from selling the Amneal RTU product. (Hofmann Dec. ¶17).

### III.    Nivagen's Forecasts Support a Bond Amount of At Least ███████████

Nivagen should not be able to reasonably contest a bond of at least ████████████ based on its own forecasts submitted during this proceeding. Contrary to its irreparable harm position, Nivagen has apparently[6] calculated projected annual sales and profits that ███████████████ ███████████████████████████████████████████████████████ ██████████████████████. According to Nivagen's CEO, Mr. Shukla:

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████

(Shukla Dec. ¶7) (emphasis added). Nivagen's economics expert Dr. Malaspina clarified that Mr. Shukla's ██████████████████ reference is to *annual sales*. (D.I. 33 ("Malaspina Dec.") ¶38). Accordingly, under Nivagen's own calculations, damages in the form of profits would range from ██████████████████████████████████████████████████████ per year. If the case is

---

[4] Nivagen assumed a ██████████████ of the vial form to the RTU form in its own calculation. (D.I. 15 ("Shukla Dec.") ¶7).

[5] Mr. Hofmann presented his analysis through December 2027 (Hofmann Dec. ¶9), consistent with statistics available for District of Delaware trials. *See* Ex. 1, Statistics from LexMachina showing average and median times to trial.

[6] For purposes of assessing a bond, it is appropriate for Amneal and the Court to consider Nivagen's projections as admissions against interest. Such consideration, however, is without prejudice to Amneal's motion to strike the Malaspina Declaration (D.I. 39-40, 44, 50) or its arguments that none of Nivagen's projected numbers were otherwise substantiated by any evidence—let alone the level of concrete evidence that is required to establish irreparable harm (*see Automated Merchandising Sys., Inc. v. Crane Co.*, 357 F. App'x 297, 300-301 (Fed. Cir. 2009)).

resolved in three years, projected profits would jump to ███████████████████████
using Nivagen's numbers. These amounts are **far higher** than the bond amount Amneal requests
that the Court require Nivagen to post if an injunction is ordered. Accordingly, Amneal's proposed
bond amount of at least ████████████ is reasonable, even if the case is resolved earlier than
Amneal's projections, especially when compared with the far higher profits forecasted by Nivagen
using the ████████████████████████████████████.

## CONCLUSION

Notwithstanding the above, Amneal maintains that the extraordinary relief of an injunction
should not be granted at least because: (1) Amneal is likely to succeed on the merits as the '291
Patent is not infringed under the doctrine of equivalents and the '661 Patent is anticipated; and (2)
there is no irreparable harm for all the reasons stated in Amneal's briefing and expert declarations
(D.I. 28, D.I. 29, D.I. 30, and D.I. 46) including because Nivagen's alleged damages would be
calculable and quantifiable. Amneal is ready to launch its product as it advised its customers and
the industry in its July 29, 2024 Press Release, and to fairly compete ████████████████████
████████████████████████████ the multiple other players in the potassium phosphates
market. Nivagen should not be able to impede fair competition with weak patents and speculation
that it might one day, through its partner, obtain FDA approval and launch another product into
the well-established multi-player potassium phosphates market. However, should the Court grant
Nivagen's motion, then Amneal respectfully requests that the Court require Nivagen to post a bond
of at least ████████████.

Respectfully,

/s/ *Anne Shea Gaza*

Anne Shea Gaza (No. 4093)

Enclosures (Exhibit 1)
cc: All Counsel of Record (via E-mail)

4

# Exhibit 1

**Lex Machina (District of Delaware Cases Pending Between 2020-01-01 and 2024-09-23)**

